**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JWALANT NATVARLAL SONEJI, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>     v.<br><br>HDFC BANK LIMITED, SASHIDHAR JAGDISHAN, and SRINIVASAN VAIDYANATHAN,<br><br>               Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jwalant Natvarlal Soneji ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by HDFC Bank Limited ("HDFC" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by HDFC; and (c) review of other publicly available information concerning HDFC.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired HDFC securities between July 17, 2023 and May 26, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. HDFC is an Indian financial services conglomerate and banking company headquartered in Mumbai. It provides a wide range of commercial and retail banking services, mortgages, and financial products.

3. On March 18, 2026, during U.S. market hours, HDFC filed a letter with the Bombay Stock Exchange and the National Stock Exchange of India Limited, reporting the resignation of Mr. Atanu Chakraborty from his roles as part-time Chairman and Independent Director of HDFC. The Company's letter attached Mr. Chakraborty's resignation letter, which stated that "*[c]ertain happenings and practices within the bank, that I have observed over last two years, are not in*

1

*congruence with my personal Values and Ethics. This is the basis of my aforementioned decision.*"[1]

4. On this news, the price of HDFC's American Depositary Shares ("ADS") fell $2.09, or 7.28% to close at $26.62 per share on March 18, 2026, on unusually heavy trading volume.

5. On May 27, 2026, before the market opened, The Indian Express published an article entitled "*HDFC Bank 'camouflaged' crores as marketing spend to pay higher interest to state firm.*" The article reported that HDFC Bank had made covert payments of approximately "Rs 45 crore," or approximately $4.7 million USD, to the Maharashtra State Road Development Corporation ("MSRDC") to induce MSRDC to make large deposits with the Company. The Company offered 6.01% interest to MSRDC, a 2.51% markup over the interest offered to other savings accounts, and paid that markup by "disguis[ing] [it] as sponsorship payments for a road safety awareness campaign run by MSRDC." Reportedly, an internal probe in March and April 2026, concluded that over ten top officials bore responsibility, including HDFC's CEO Sashidhar Jagdishan.

6. On this news, HDFC's ADS price fell $1.02, or 4.1%, to close at $23.78 per share on May 27, 2026, on unusually heavy trading volume.

7. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) HDFC Bank camouflaged payments as marketing spend to pay higher interest to a state firm in order to induce deposits; (2) these activities were approved by senior management; (3) these activities

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

2

likely violated regulations and the Company's own policies, including those that prohibit payments that could constitute improper inducement; (4) as a result of the foregoing, the Company's interest income and operating expenses were overstated; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13.    Plaintiff Jwalant Natvarlal Soneji, as set forth in the accompanying certification, incorporated by reference herein, purchased HDFC securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.    Defendant HDFC is incorporated under the laws of India with its principal executive offices located in Mumbai, India. HDFC's ADS trade on the New York Stock Exchange ("NYSE") under the symbol "HDB." Each ADS represents 3 equity shares of HDFC.

15.    Defendant Sashidhar Jagdishan ("Jagdishan") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.    Defendant Srinivasan Vaidyanathan ("Vaidyanathan") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.    Defendants Jagdishan and Vaidyanathan (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    HDFC is an Indian financial services conglomerate and banking company headquartered in Mumbai. It provides a wide range of commercial and retail banking services, mortgages, and financial products.

### Materially False and Misleading

### Statements Issued During the Class Period

19.    The Class Period begins on July 17, 2023. On that day, HDFC issued a press release announcing financial results for first fiscal quarter of 2024, the quarter ended June 30, 2023. The press release touted the Company's financial results, including as follows, in relevant part:

> ***Net interest income (interest earned less interest expended) for the quarter ended June 30, 2023 grew by 21.1% to ₹ 23,599 crore from ₹ 19,481 crore for the quarter ended June 30, 2022. Core net interest margin was at 4.1% on total assets, and 4.3% based on interest earning assets.***

> \*        \*        \*

> Operating expenses for the quarter ended June 30, 2023 were ₹ 14,057 crore, an increase of 33.9% over ₹ 10,502 crore during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 42.8%.

20.     On October 16, 2023, the Company announced its second quarter 2024 financial results in a press release for the period ended September 30, 2023. The press release touted the Company's financial results, including as follows, in relevant part:

> ***Net interest income (interest earned less interest expended) for the quarter ended September 30, 2023 grew by 30.3% to ₹ 27,385 crore from ₹ 21,021 crore for the quarter ended September 30, 2022. Core net interest margin for the quarter was 3.65% on total assets and 3.85% on interest earning assets.*** After absorbing debt funded cost for additional liquidity and merger management, the reported NIM for the quarter is 3.4% on total assets and 3.6% on interest earning assets.

> \*        \*        \*

5

Operating expenses for the quarter ended September 30, 2023 were ₹ 15,399 crore, an increase of 37.2% over ₹ 11,225 crore during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 40.4%.

21.    On January 16, 2024, the Company announced its third quarter 2024 financial results in a press release for the period ended December 31, 2023. The press release touted the Company's financial results, including as follows, in relevant part:

> ***Net interest income (interest earned less interest expended) for the quarter ended December 31, 2023 grew by 23.9% to ₹ 284.7 billion from ₹ 229.9 billion for the quarter ended December 31, 2022. Core net interest margin was at 3.4% on total assets, and 3.6% based on interest earning assets.***

*    *    *

> Operating expenses for the quarter ended December 31, 2023 were ₹ 159.6 billion, an increase of 28.1% over ₹ 124.6 billion during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 40.3%.

22.    On April 20, 2024, the Company announced its forth quarter and full year 2024 financial results in a press release for the period ended March 31, 2024. The press release touted the Company's financial results, including as follows, in relevant part:

> ***Net interest income (interest earned less interest expended) for the quarter ended March 31, 2024 grew by 24.5% to ₹ 290.8 billion from ₹ 233.5 billion for the quarter ended March 31, 2023. Core net interest margin was at 3.44% on total assets, and 3.63% based on interest earning assets.***

*    *    *

> Operating expenses for the quarter ended March 31, 2024 were ₹ 179.7 billion, an increase of 33.5% over ₹ 134.6 billion during the corresponding quarter of the previous year. Operating expenses for the quarter ended March 31, 2024 included staff ex-gratia provision of ₹ 15 billion. The cost-to-income ratio for the quarter was at 38.0%. Excluding certain transaction gains and the ex-gratia provision, cost to income ratio for the quarter was at 41.3%.

23.    On July 20, 2024, the Company announced its first quarter 2025 financial results in a press release for the period ended June 30, 2024. The press release touted the Company's financial results, including as follows, in relevant part:

6

*Net interest income (interest earned less interest expended) for the quarter ended June 30, 2024 grew by 26.4% to ₹ 298.4 billion from ₹ 236.0 billion for the quarter ended June 30, 2023. Core net interest margin was at 3.47% on total assets, and 3.66% based on interest earning assets.*

\*     \*     \*

Operating expenses for the quarter ended June 30, 2024 were ₹ 166.2 billion, an increase of 18.2% over ₹ 140.6 billion during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 41.0%.

24.     On July 29, 2024, the Company submitted its annual report for the fiscal year ended March 31, 2024 on a Form 20-F filed with the SEC (the "FY24 20-F"). The FY24 20-F affirmed the previously reported financial results. The FY24 20-F purported to warn of interest rate risks, stating in relevant part:

*Our business is particularly vulnerable to interest rate risk, and volatility in interest rates could adversely affect our net interest margin, the value of our fixed income portfolio, our treasury income and our financial performance.*

Our results of operations depend to a great extent on our net interest revenue. During fiscal year 2023, net interest revenue after provision for credit losses represented 74.2 percent of our net revenue. During fiscal year 2024, it represented 60.1 percent of our net revenue. Changes in market interest rates affect the interest rates charged on our interest-earning assets differently from the interest rates paid on our interest-bearing liabilities and also affect the value of our investments. An increase in interest rates could result in an increase in interest expense relative to interest revenue if we are not able to increase the rates charged on our loans, which would lead to a reduction in our net interest revenue and net interest margin. Further, an increase in interest rates could negatively affect demand for our loans and credit substitutes, and we may not be able to achieve our volume growth, which could adversely affect our net income. A decrease in interest rates could result in a decrease in interest revenue relative to interest expense due to the repricing of our loans at a pace faster than the rates we pay on our interest-bearing liabilities. The quantum of the changes in interest rates for our assets and liabilities may also be different. For example, our net interest margins decreased in fiscal year 2024 as a result of the Transaction because HDFC Limited had a relatively lower-yielding asset product mix and a relatively higher cost of funds compared to the Bank.

\*     \*     \*

Domestically, in fiscal year 2025, bond yields are expected to moderate along with global yields. Additionally, foreign inflows in the debt segment (due to inclusion in the J.P. Morgan Bond Index), moderating inflation and monetary easing are likely

7

to drive domestic yields down. However, if inflationary pressures persist, system liquidity tightens, global yields stay elevated due to fewer than expected rate cuts, domestic yields could harden. ***Additionally, any volatility in interest rates could adversely affect our net interest margin, the value of our fixed income portfolio, our treasury income and our financial performance.***

25.    The FY24 20-F also purported to warn that failure to comply with banking regulations "could" negatively affect the business. Specifically, the report stated, in relevant part:

> ***We have previously been subjected to penalties imposed by the RBI and the SEBI. Any regulatory investigations, fines, sanctions and requirements relating to conduct of business and financial crime could negatively affect our business and financial results, or cause serious reputational harm.***
>
> The RBI is empowered under the Banking Regulation Act 1949 to impose monetary and non-monetary penalties on banks and their employees in order to enforce applicable regulatory requirements. During 2019, we received two separate fines for non-compliance with certain RBI directives. In its order dated February 4, 2019, the RBI imposed a monetary penalty of Rs. 2.0 million on us for failing to comply with the RBI's KYC and AML standards, as set out in their circulars dated November 29, 2004 and May 22, 2008. In its order dated June 13, 2019, the RBI imposed a monetary penalty of Rs. 10 million on us for failing to comply with the KYC, AML and fraud reporting standards, following an investigation into bills of entry submitted by certain importers. The penalties were imposed under Section 47A(1)(c) and Section 46(4)(i) of the Banking Regulation Act 1949. We have since implemented corrective action to strengthen our internal control mechanisms so as to ensure that such incidents will not repeat themselves.
>
> *    *    *
>
> We cannot predict the initiation or outcome of any further investigations by other authorities or different investigations by the RBI. The penalties imposed by the RBI have generated adverse publicity for our business. Such adverse publicity, or any future scrutiny, investigation, inspection or audit which could result in fines, public reprimands, damage to our reputation, significant time and attention from our management, costs for investigations and remediation of affected customers, may materially adversely affect our business and financial results.

26.    The FY24 20-F further stated that "***management has concluded that our internal control over financial reporting was effective as of March 31, 2024***." The Company further warned "***[s]ignificant fraud, system failure or calamities would disrupt our revenue-generating***

8

*activities in the short term and could harm our reputation and adversely impact our revenue-generating capabilities."* Specifically, the FY24 20-F stated as follows, in relevant part:

> **Significant fraud, system failure or calamities would disrupt our revenue-generating activities in the short term and could harm our reputation and adversely impact our revenue-generating capabilities.**
>
> Our business is highly dependent on our ability to efficiently and reliably process a high volume of transactions across numerous locations and delivery channels. We place heavy reliance on our technology infrastructure for processing this data and, therefore, ensuring the security of this system and its availability is of paramount importance. **Our systemic and operational controls may not be adequate to prevent any adverse impact from frauds**, errors, hacking and system failures. A significant system breakdown or system failure caused by intentional or unintentional acts would have an adverse impact on our revenue-generating activities and lead to financial loss. Our reputation could be adversely affected by fraud committed by employees, customers or outsiders, or by our perceived inability to properly manage fraud-related risks. Our inability or perceived inability to manage these risks could lead to enhanced regulatory oversight and scrutiny.

27.    On October 19, 2024, the Company announced its second quarter 2025 financial results in a press release for the period ended September 30, 2024. The press release touted the Company's financial results, including as follows, in relevant part:

> **Net interest income (interest earned less interest expended) for the quarter ended September 30, 2024 grew by 10.0% to ₹ 301.1 billion from ₹ 273.9 billion for the quarter ended September 30, 2023. Core net interest margin was at 3.46% on total assets, and 3.65% based on interest earning assets.**
>
> *                *                *
>
> Operating expenses for the quarter ended September 30, 2024 were ₹ 168.9 billion, an increase of 9.7% over ₹ 154.0 billion during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 40.6%.

28.    On January 22, 2025, the Company announced its third quarter 2025 financial results in a press release for the period ended December 31, 2024. The press release touted the Company's financial results, including as follows, in relevant part:

> Net interest income (interest earned less interest expended) for the quarter ended December 31, 2024 grew by 7.7% to ₹ 306.5 billion from ₹ 284.7 billion for the

9

quarter ended December 31, 2023. Core net interest margin was at 3.43% on total assets, and 3.62% based on interest earning assets.

\*        \*        \*

Operating expenses for the quarter ended December 31, 2024 were ₹ 171.1 billion, an increase of 7.2% over ₹ 159.6 billion during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 40.6%.

29.    On April 19, 2025, the Company announced its fourth quarter and full year 2025 financial results in a press release for the period ended March 31, 2025. The press release touted the Company's financial results, including as follows, in relevant part:

> ***Net interest income (interest earned less interest expended) for the quarter ended March 31, 2025 grew by 10.3% to ₹ 320.7 billion from ₹ 290.8 billion for the quarter ended March 31, 2024. Net interest margin was at 3.54% on total assets, and 3.73% based on interest earning assets. Excluding ₹ 7 bn of interest on income tax refund, core net interest margin was at 3.46% on total assets, and 3.65% based on interest earning assets.***

\*        \*        \*

> Operating expenses for the quarter ended March 31, 2025 were ₹ 175.6 billion as against ₹ 179.7 billion (which included staff ex-gratia provision of ₹ 15.0 billion) during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 39.8%.

30.    On July 19, 2025, the Company announced its first quarter 2026 financial results in a press release for the period ended June 30, 2025. The press release touted the Company's financial results, including as follows, in relevant part:

> ***Net interest income (interest earned less interest expended) for the quarter ended June 30, 2025 grew by 5.4% to ₹ 314.4 billion from ₹ 298.4 billion for the quarter ended June 30, 2024.*** Core net interest margin was at 3.35% on total assets, reflecting assets repricing faster than deposits, as against 3.46% for the prior quarter ended March 31, 2025.
>
> Other income (non-interest revenue) for the quarter ended June 30, 2025 was ₹ 217.3 billion. The four components of other income for the quarter ended June 30, 2025 were fees & commissions of ₹ 75.9 billion (₹ 70.5 billion in the corresponding quarter of the previous year), foreign exchange & derivatives revenue of ₹ 16.3 billion (₹ 14.0 billion in the corresponding quarter of the previous year), net trading and mark to market gain of ₹ 101.1 billion, including transaction gains of ₹ 91.3

billion mentioned above (gain of ₹ 2.2 billion in the corresponding quarter of the previous year) and miscellaneous income, including recoveries and dividend of ₹ 24.0 billion (₹ 20.1 billion in the corresponding quarter of the previous year).

Operating expenses for the quarter ended June 30, 2025 were ₹ 174.3 billion, as against ₹ 166.2 billion during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter, excluding the transaction gains mentioned above was at 39.6%.

31.    On July 14, 2025, the Company submitted its annual report for the fiscal year ended March 31, 2025 on a Form 20-F filed with the SEC (the "FY25 20-F"). The FY25 20-F affirmed the previously reported financial results. The FY25 20-F purported to warn of interest rate risks, stating in relevant part:

> ***Our business is particularly vulnerable to interest rate risk, and volatility in interest rates could adversely affect our net interest margin, the value of our fixed income portfolio, our treasury income and our financial performance.***
>
> Our results of operations depend to a great extent on our net interest revenue. During fiscal years 2023 and 2024, net interest revenue after provision for credit losses represented 74.2 percent and 60.1 percent of our net revenue, respectively. During fiscal year 2025, it represented 55.8 percent of our net revenue. Changes in market interest rates affect the interest rates charged on our interest-earning assets differently from the interest rates paid on our interest-bearing liabilities and also affect the value of our investments. An increase in interest rates could result in an increase in interest expense relative to interest revenue if we are not able to increase the rates charged on our loans, which would lead to a reduction in our net interest revenue and net interest margin. Further, an increase in interest rates could negatively affect demand for our loans and credit substitutes, and we may not be able to achieve our volume growth, which could adversely affect our net income. A decrease in interest rates could result in a decrease in interest revenue relative to interest expense due to the repricing of our loans at a pace faster than the rates we pay on our interest-bearing liabilities. The quantum of the changes in interest rates for our assets and liabilities may also be different. For example, our net interest margins decreased in fiscal year 2024 as a result of the Transaction because HDFC Limited had a relatively lower-yielding asset product mix and a relatively higher cost of funds compared to the Bank, and in fiscal year 2025, they were marginally lower than in fiscal year 2024.
>
> \*      \*      \*
>
> Domestically, in fiscal year 2026, bond yields are expected to moderate. There is a likelihood of decoupling of domestic bond yields from those of the United States, driven by multiple factors including tariff-related uncertainty and geopolitical

11

developments. Additionally, an expected increase in foreign inflows in the debt segment (due to inclusion in the J.P. Morgan Bond Index from June 2024 and the Bloomberg Local EM Debt Index from January 2025), coupled with moderating inflation and monetary easing are likely to drive domestic yields down. However, if inflationary pressures increase, system liquidity tightens, and/or global yields increase significantly, domestic yields could harden. ***Additionally, any volatility in interest rates could adversely affect our net interest margin, the value of our fixed income portfolio, our treasury income and our financial performance.***

32.     The FY25 20-F also purported to warn that failure to comply with banking regulations "could" negatively affect the business. Specifically, the report stated, in relevant part:

> ***We have previously been subjected to penalties imposed by the RBI, the SEBI and other authorities. Any regulatory investigations, fines, sanctions and requirements relating to conduct of business and financial crime, whether by domestic or overseas authorities, could negatively affect our business and financial results, or cause serious reputational harm.***
>
> In India, the RBI is empowered under the Banking Regulation Act to impose monetary and non-monetary penalties on banks and their employees in order to enforce applicable regulatory requirements. We are also subject to penalties under SEBI regulations in respect of capital issuances as well as some other activities, including acting as agent for collecting subscriptions to public offerings of securities made by other Indian companies, underwriter, custodian, depository participant and investment banker, and because our equity shares are listed on Indian stock exchanges. Various other authorities, both in India and overseas, also regulate our activities and have the power to impose penalties.
>
> \*     \*     \*
>
> We cannot predict the initiation or outcome of any further investigations by the RBI or the SEBI, or by other authorities, including overseas authorities, relating to our operations in India or abroad, which may include investigations with respect to KYC, AML, fraud reporting standards, customer due diligence, transaction settlement procedures, misselling or other matters. Some of the penalties imposed by the RBI have generated adverse publicity for our business. Such adverse publicity, or any future scrutiny, investigation, inspection or audit which could result in fines, public reprimands, damage to our reputation, significant time and attention from our management, costs for investigations and remediation of affected customers, may materially adversely affect our business and financial results.

33.     The FY25 20-F further stated that "***management has concluded that our internal control over financial reporting was effective as of March 31, 2025***." The Company further warned "***[s]ignificant fraud, system failure or calamities would disrupt our revenue-generating***

12

*activities in the short term and could harm our reputation and adversely impact our revenue-generating capabilities.*" Specifically, the FY25 20-F stated as follows, in relevant part:

> *Significant fraud, system failure or calamities would disrupt our revenue-generating activities in the short term and could harm our reputation and adversely impact our revenue-generating capabilities.*
>
> Our business is highly dependent on our ability to efficiently and reliably process a high volume of transactions across numerous locations and delivery channels. We place heavy reliance on our technology infrastructure for processing this data and, therefore, ensuring the security of this system and its availability is of paramount importance. Our systemic and operational controls may not be adequate to prevent any adverse impact from digital frauds, including via so-called money mules, as well as from errors, hacking and system failures. *A significant system breakdown or system failure caused by intentional or unintentional acts would have an adverse impact on our revenue-generating activities and lead to financial loss. Our reputation could be adversely affected by fraud committed by employees,* customers or outsiders, or by our perceived inability to properly manage fraud-related risks. Our inability or perceived inability to manage these risks could lead to enhanced regulatory oversight and scrutiny.

34.    On October 18, 2025, the Company announced its second quarter 2026 financial results in a press release for the period ended September 30, 2025. The press release touted the Company's financial results, including as follows, in relevant part:

> The Bank's *net revenue grew by 10.3% to ₹ 459.0 billion* for the quarter ended September 30, 2025 from ₹ 416.0 billion for the quarter ended September 30, 2024.
>
> *Net interest income (interest earned less interest expended) for the quarter ended September 30, 2025 grew by 4.8% to ₹ 315.5 billion* from ₹ 301.1 billion for the quarter ended September 30, 2024. Core net interest margin was at 3.27% on total assets, reflecting assets repricing faster than deposits, as against 3.35% for the prior quarter ended June 30, 2025.
>
> Other income (non-interest revenue) for the quarter ended September 30, 2025 was ₹ 143.5 billion. The four components of other income for the quarter ended September 30, 2025 were fees & commissions of ₹ 88.4 billion (₹ 81.4 billion in the corresponding quarter of the previous year), foreign exchange & derivatives revenue of ₹ 15.9 billion (₹ 14.6 billion in the corresponding quarter of the previous year), net trading and mark to market gain of ₹ 23.9 billion (₹ 2.9 billion in the corresponding quarter of the previous year) and miscellaneous income, including recoveries and dividend of ₹ 15.3 billion (₹ 15.9 billion in the corresponding quarter of the previous year).

13

Operating expenses for the quarter ended September 30, 2025 were ₹ 179.8 billion, as against ₹ 168.9 billion during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 39.2%.

35.    On January 17, 2026, the Company announced its third quarter 2026 financial results in a press release for the period ended December 31, 2025. The press release touted the Company's financial results, including as follows, in relevant part:

The Bank's **net revenue grew by 8.9% to ₹ 458.7 billion** for the quarter ended December 31, 2025 from ₹ 421.1 billion for the quarter ended December 31, 2024.

***Net interest income (interest earned less interest expended) for the quarter ended December 31, 2025 grew by 6.4% to ₹ 326.2 billion*** from ₹ 306.5 billion for the quarter ended December 31, 2024. Core net interest margin was at 3.35% on total assets, and 3.51% based on interest earning assets.

Other income (non-interest revenue) for the quarter ended December 31, 2025 was ₹ 132.5 billion. The four components of other income for the quarter ended December 31, 2025 were fees & commissions of ₹ 92.3 billion (₹ 81.8 billion in the corresponding quarter of the previous year), foreign exchange & derivatives revenue of ₹ 14.3 billion (₹ 14.0 billion in the corresponding quarter of the previous year), net trading and mark to market gain of ₹ 9.3 billion (₹ 0.7 billion in the corresponding quarter of the previous year) and miscellaneous income, including recoveries and dividend of ₹ 16.6 billion (₹ 17.9 billion in the corresponding quarter of the previous year).

Operating expenses for the quarter ended December 31, 2025 were ₹ 187.7 billion. Operating expenses excluding the estimated impact of ₹ 8.0 billion for employee benefits under the New Labour Code were ₹ 179.7 billion, as against ₹ 171.1 billion during the corresponding quarter of the previous year. The core cost-to-income ratio for the quarter was at 39.2%.

36.    The above statements identified in ¶¶19-35 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) HDFC Bank camouflaged payments as marketing spend to pay higher interest to a state firm in order to induce deposits; (2) these activities were approved by senior management; (3) these activities likely violated banking regulations and the Company's own policies, including those that prohibit payments that could constitute improper inducement; (4) as a result of the foregoing, the

14

Company's interest income and operating expenses were overstated; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

37.    The truth began to emerge on March 18, 2026, during U.S. market hours, when HDFC filed a letter with the Bombay Stock Exchange and the National Stock Exchange of India Limited, reporting the resignation of Mr. Atanu Chakraborty from his roles as  part-time Chairman and Independent Director of HDFC. The Company's letter attached Mr. Chakraborty's resignation letter, which stated that "***[c]ertain happenings and practices within the bank, that I have observed over last two years, are not in congruence with my personal Values and Ethics. This is the basis of my aforementioned decision.***"

38.    On this news, the price of HDFC's ADS fell $2.09 or 7.28% to close at $26.62 per share on March 18, 2026, on unusually heavy trading volume.

39.    On April 18, 2026, the Company announced its fourth quarter and full year 2026 financial results in a press release for the period ended March 31, 2026. The press release touted the Company's financial results, including as follows, in relevant part:

> The Bank's net revenue grew by 5.0% to ₹ 462.8 billion for the quarter ended March 31, 2026 from ₹ 440.9 billion for the quarter ended March 31, 2025.
>
> ***Net interest income (interest earned less interest expended) for the quarter ended March 31, 2026 grew by 3.2% to ₹ 330.8 billion*** from ₹ 320.7 billion for the quarter ended March 31, 2025. Net interest margin was at 3.38% on total assets, and 3.53% based on interest earning assets.
>
> Other income (non-interest revenue) for the quarter ended March 31, 2026 was ₹ 132.0 billion. The four components of other income for the quarter ended March 31, 2026 were fees & commissions of ₹ 92.2 billion (₹ 85.3 billion in the corresponding quarter of the previous year), foreign exchange & derivatives revenue of ₹ 14.9 billion (₹ 14.4 billion in the corresponding quarter of the previous year), net trading and mark to market gain of ₹ 8.2 billion (₹ 3.9 billion in the corresponding quarter of the previous year) and miscellaneous income, including recoveries and dividend of ₹ 16.7 billion (₹ 16.7 billion in the corresponding quarter of the previous year).

Operating expenses for the quarter ended March 31, 2026 were ₹ 184.8 billion, as against ₹ 175.6 billion during the corresponding quarter of the previous year. The cost-to-income ratio for the quarter was at 39.9%

40.    The above statements identified in ¶¶37, 39 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) HDFC Bank camouflaged payments as marketing spend to pay higher interest to a state firm in order to induce deposits; (2) these activities were approved by senior management; (3) these activities likely violated regulations and the Company's own policies, including those that prohibit payments that could constitute improper inducement; (4) as a result of the foregoing, the Company's interest income and operating expenses were overstated; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

41.    On May 27, 2026, before the market opened, the newspaper The Indian Express published an article entitled "***HDFC Bank 'camouflaged' crores as marketing spend to pay higher interest to state firm.***" The article reported that HDFC Bank had made covert payments of approximately "Rs 45 crore," or approximately $4.7 million USD to the MSRDC to induce MSRDC to make large deposits with the Company in exchange for 6.01% interest, or 2.51% above the rates offered to other customers. Ro pay out this interest far above what it gave regular customers, "[t]he solution allegedly devised by senior management: ***route the differential through the marketing department, disguised as sponsorship payments for a road safety awareness campaign run by MSRDC***." Specifically, the article stated as follows, in relevant part:

**HDFC Bank 'camouflaged' crores as marketing spend to pay higher interest to state firm**

16

*In March, HDFC Bank chairman quit citing ethics. What bank didn't reveal: Its probe found that violating RBI, bank's norms, Rs 45-cr extra interest was paid to Maharashtra State Road Development Corp as sponsorship for road safety drive.*

Written by: Sandeep Singh

        *             *             *

When Atanu Chakraborty abruptly resigned on March 18 as chairman of HDFC Bank, the country's largest private bank, citing "certain happenings and practices within the bank" that were not in "congruence" with his personal values and ethics, it didn't ring many alarm bells across the banking establishment.

The bank's newly appointed interim chairman, Keki Mistry, was quick to step in with a statement. "The bank has very strong ethics," he said on March 19. "I would never remain on the board if there were any issues with governance." He said board members had pressed Chakraborty for details the previous day but he "did not give any specific explanation."

        *             *             *

What went undisclosed was that, just six days earlier, on March 12, the Audit Committee of the Board (ACB), under the chairmanship of M D Ranganath, had ordered a formal "Internal Vigilance Investigation" into payments totalling Rs 45 crore made to the Maharashtra State Road Development Corporation (MSRDC), a state government agency, during FY2024 and FY2025.

        *             *             *

This order came after an internal audit of the bank's marketing department, covering the period 2024-25, which had flagged these payments and rated the department's performance as "unsatisfactory."

These payments, *The Indian Express* investigation, based on internal records, has revealed, were meant for MSRDC as "differential interest" i.e., interest over and above the specified rate, on its deposits. But instead of being credited directly to MSRDC's account as interest earned, they were routed through the bank's marketing department, disguised as contributions to a road safety awareness campaign through four local vendors.

        *             *             *

In 2021, HDFC Bank approached MSRDC, a Maharashtra government infrastructure agency, seeking its savings deposits. The bank was then offering 3.5% interest on savings accounts. MSRDC, sources say, "verbally" indicated that competing financial institutions were offering 6% or higher, and said it would route

17

deposits from a major land acquisition project — anticipated to be in the range of Rs 25,000 crore — through HDFC Bank, if it received a rate of at least 6.01%.

*        *        *

To accommodate this, the bank's Asset Liability Committee approved a special savings bank interest rate of 4.5% — applicable to certain large deposits — in anticipation that MSRDC would bring in over Rs 10,000 crore. When only around Rs 200 crore arrived in the initial months, the 4.5% window was shut after two months, in April 2022.

This created a problem. The bank had committed to 6.01% but could no longer offer even 4.5% through normal channels. The gap between what all regular customers received (3.5%) and what MSRDC had been promised (6.01%) — a differential of 2.51 percentage points — had to be paid out somehow.

The solution allegedly devised by senior management: route the differential through the marketing department, disguised as sponsorship payments for a road safety awareness campaign run by MSRDC.

Letters formalising the arrangement were signed not by senior executives but by a junior staff member, acting on the instruction of a cluster head and — according to the vigilance report — "verbally cleared" by a zonal head.

The letters did not specify the tenure of the arrangement or any minimum balance threshold. They were, the report notes, "not vetted by legal or compliance teams" and made no mention of the 6.01% return that had been internally agreed upon. These "incomplete and poorly drafted" letters subsequently became the basis for MSRDC's insistence on receiving differential interest payments.

MSRDC began placing funds with the bank from February 2022. Deposits never reached the anticipated scale — crossing Rs 3,000 crore for only a couple of months in 2023. From 2023 through 2025, however, HDFC Bank made a series of payments to MSRDC, aggregating to approximately Rs 45 crore, in what the vigilance report characterises as disguised interest compensation.

How crores were paid to MSRDC

The internal audit report shows how thin the cover story was.

HDFC Bank's marketing department, the audit found, paid contributions aggregating to Rs 39.7 crore between 2023-24 and 2024-25 toward MSRDC's "Road Safety Awareness Campaign".

42.    The article stated that the internal probe produced a report that found numerous

"regulatory and governance breaches." The report "flags a violation of the bank's own anti-bribery

18

and anti-corruption policy," which "prohibits payments that could constitute 'improper inducement.'" According to the article, "[r]outing interest payments through vendors in the form of marketing expenses, the report holds, falls squarely within that prohibition." Specifically, the article stated:

> Banking norms that were violated, breached
>
> The vigilance report, according to sources, identifies a cluster of serious regulatory and governance breaches.
>
> Most significantly, it flags a violation of the RBI's Master Directions on interest rates on deposits, which explicitly prohibit banks from offering negotiated returns to individual depositors. By routing the differential interest to MSRDC through vendor payments, effectively compensating a customer at a rate unavailable to others, the bank is alleged to have done what the regulation forbids.
>
> The report also flags a violation of the bank's own anti-bribery and anti-corruption policy. The policy prohibits payments that could constitute "improper inducement". Routing interest payments through vendors in the form of marketing expenses, the report holds, falls squarely within that prohibition.
>
> A top source familiar with the inquiry said, "Not only is this a violation of the Banking Regulation Act, it also raises questions of ethics. Banks cannot give a negotiated rate to any one customer and cannot incentivise customers for keeping deposits beyond a certain limit."
>
> The source said that because payments were routed through vendors rather than credited directly to MSRDC as interest payment, the vendors would have raised invoices and claimed input tax credit — creating an additional layer of irregularity.

43.     Reportedly, an internal probe in March and April 2026, concluded that over ten top officials bore responsibility, including Defendant Jagdishan. Specifically, the article stated:

> Significantly, records reveal that this payout was approved in the presence of HDFC Bank MD & CEO Sashidhar Jagdishan during senior-level discussions where a higher rate for MSRDC was "verbally" agreed upon. Many officials have testified in the internal probe that Jagdishan "participated in the call convened to examine how the bank could compensate MSRDC and was part of the decision to provide the differential interest through the marketing budget as a one-off arrangement."

*          *          *

19

Interviews with bank officials and scrutiny of internal documents reveal that the vigilance inquiry — conducted between March and April this year — concluded that more than 10 top officials bore responsibility. These include: MD & CEO Jagdishan; CFO Srinivasan Vaidyanathan and Chief Marketing Officer Ravi Santhanam.

44.    On this news, the price of HDFC's ADS fell $1.02, or 4.1%, to close at $23.78 per share on May 27, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

45.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired HDFC securities between July 17, 2023 and May 26, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

46.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HDFC's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of HDFC shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by HDFC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20

48.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

49.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of HDFC; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

50.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

51.    The market for HDFC's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, HDFC's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired HDFC's securities relying upon the integrity of the market price of the Company's securities and market information relating to HDFC, and have been damaged thereby.

52.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HDFC's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about HDFC's business, operations, and prospects as alleged herein.

53.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about HDFC's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

54.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

55.    During the Class Period, Plaintiff and the Class purchased HDFC's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information

22

alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

56. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding HDFC, their control over, and/or receipt and/or modification of HDFC's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning HDFC, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

57. The market for HDFC's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, HDFC's securities traded at artificially inflated prices during the Class Period. On July 23, 2025, the Company's share price closed at a Class Period high of $39.47 per ADS. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of HDFC's securities and market information relating to HDFC, and have been damaged thereby.

58. During the Class Period, the artificial inflation of HDFC's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages

23

sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about HDFC's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of HDFC and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

59.    At all relevant times, the market for HDFC's securities was an efficient market for the following reasons, among others:

(a)    HDFC shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, HDFC filed periodic public reports with the SEC and/or the NYSE;

(c)    HDFC regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    HDFC was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

24

60.    As a result of the foregoing, the market for HDFC's securities promptly digested current information regarding HDFC from all publicly available sources and reflected such information in HDFC's share price. Under these circumstances, all purchasers of HDFC's securities during the Class Period suffered similar injury through their purchase of HDFC's securities at artificially inflated prices and a presumption of reliance applies.

61.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

62.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of HDFC who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase HDFC's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

65.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for HDFC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

26

66.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about HDFC's financial well-being and prospects, as specified herein.

67.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of HDFC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about HDFC and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

68.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the

27

Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

69. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing HDFC's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

70. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of HDFC's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired HDFC's securities during the Class Period at artificially high prices and were damaged thereby.

71.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that HDFC was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their HDFC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

72.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

74.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

75.    Individual Defendants acted as controlling persons of HDFC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff

29

contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.    As set forth above, HDFC and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

30

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 13, 2026                    **GLANCY PRONGAY WOLKE & ROTTER LLP**

By: */s/ Rebecca Dawson*
Rebecca Dawson
745 5th Avenue, 5th Floor
New York, NY 10151
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email: rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
clinehan@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Counsel for Plaintiff Jwalant Natvarlal Soneji*

31

## SWORN CERTIFICATION OF PLAINTIFF

HDFC Bank Limited, SECURITIES LITIGATION

I, Jwalant Natvarlal Soneji , certify:

1. I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2. I did not purchase HDFC Bank Limited, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under federal securities law.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in HDFC Bank Limited, during the class period set forth in the Complaint are as follows:

    See Attached Transactions

5. I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing are true and correct statements.

8/12/2026

Dated: _____

Signed by:

DFD414E2536B4F3...

_____

Jwalant Natvarlal Soneji

**Jwalant Natvarlal Soneji's Transactions in HDFC Bank Limited (HDB)**

### Account 1

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 1/29/2026 | Bought | 76.0000 | $32.5000 |
| 4/28/2026 | Bought | 116.0000 | $25.6100 |
| 5/7/2026 | Bought | 80.0000 | $25.8500 |

### Account 2

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 8/13/2025 | Bought | 0.2840 | $74.1400 |
| 8/28/2025 | Bought | 0.2628 | $71.4500 |
| 9/17/2025 | Sold | -1.0000 | $36.0900 |
| 9/19/2025 | Bought | 121.0000 | $35.4600 |
| 1/12/2026 | Bought | 42.0000 | $33.0000 |
| 5/19/2026 | Bought | 1.0000 | $24.2000 |

### Account 3

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 12/20/2024 | Bought | 11.7911 | $64.1500 |
| 12/27/2024 | Bought | 0.2944 | $64.5600 |
| 1/6/2025 | Bought | 10.0000 | $62.1000 |
| 1/24/2025 | Bought | 10.0000 | $58.5000 |
| 2/4/2025 | Sold | -10.0000 | $61.0500 |
| 2/14/2025 | Bought | 5.0000 | $60.1700 |
| 2/20/2025 | Bought | 12.0000 | $59.8500 |
| 3/18/2025 | Sold | -12.0000 | $62.2500 |
| 3/19/2025 | Sold | -5.0000 | $62.6400 |
| 3/21/2025 | Sold | -10.0000 | $64.2500 |
| 3/31/2025 | Sold | -0.0855 | $66.1900 |
| 3/31/2025 | Sold | -12.0000 | $65.9500 |
| 4/28/2025 | Bought | 4.0000 | $71.6200 |
| 4/29/2025 | Sold | -4.0000 | $72.3400 |
| 4/30/2025 | Bought | 0.1335 | $72.3300 |
| 4/30/2025 | Bought | 0.0234 | $72.3700 |
| 4/30/2025 | Bought | 0.4056 | $72.3700 |
| 5/12/2025 | Bought | 0.0775 | $72.1700 |
| 5/12/2025 | Bought | 0.3854 | $72.1700 |
| 5/13/2025 | Bought | 31.0000 | $72.3100 |
| 5/15/2025 | Sold | -32.0000 | $73.0500 |
| 5/20/2025 | Bought | 50.0000 | $72.4700 |
| 5/21/2025 | Sold | -50.0000 | $73.2000 |
| 5/23/2025 | Sold | -0.0254 | $74.1200 |

### Account 4

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 12/30/2024 | Bought | 15.0000 | $63.7500 |
| 1/21/2025 | Sold | -15.0000 | $58.5700 |